IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**
AUG 1 4 2012
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>(Party in Interest) )<br>)<br>ex rel. )<br>)<br>RODERICK TERRY )<br>18 R STREET, NW<br>WASHINGTON, DC 20001<br><br>          PLAINTIFF/RELATOR,<br><br>          v. )<br>)<br>AMERICAN BAR ASSOCIATION )<br>21 NORTH CLARK STREET )<br>21st FLOOR )<br>CHICAGO, IL 60654-7598 )<br>)<br>          And )<br>)<br>ROBERT HOROWITZ )<br>AMERICAN BAR ASSOCIATION )<br>740 15th STREET, NW 1ST FLOOR )<br>WASHINGTON, DC 20005 )<br>)<br>          And )<br>)<br>ELISSA LICHTENSTEIN )<br>AMERICAN BAR ASSOCIATION )<br>740 15TH STREET, NW 1ST FLOOR )<br>WASHINGTON, DC 20005 )<br>)<br>          And )<br>)<br>COUNCIL ON LEGAL EDUCATION )<br>OPPORTUNITY (CLEO) )<br>740 15TH STREET, NW 1ST FLOOR )<br>WASHINGTON, DC 20005 )<br>)<br>          And ) | **COMPLAINT FILED UNDER SEAL**<br><br>Case: 1:12-cv-01336<br>Assigned To : Kessler, Gladys<br>Assign. Date : 8/14/2012<br>Description: General Civil |

\

| | |
|---|---|
| CASSANDRA SNEED OGDEN<br>COUNCIL ON LEGAL EDUCATION<br>OPPORTUNITY (CLEO)<br>740 15TH STREET, NW 1ST FLOOR<br>WASHINGTON, DC 20005<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT
(False Claims Act/QuiTam Action)

Plaintiff Roderick Terry, by and through his attorneys, sues Defendants the American Bar Association (ABA), Robert Horowitz, Elissa Lichtenstein, the Council on Legal Education Opportunity (CLEO) and Cassandra Sneed Ogden and for his Complaint states as follows:

### Jurisdiction

1. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. Section 1331, and 31 U.S.C. Section 3729 et seq.

2. Venue is proper in this court pursuant to 28 U.S.C. Section 1391(b), in that all or some of the events or omissions giving rise to Terry's claims occurred in this jurisdiction and the Defendants may be found in this judicial district.

### Parties

3. Roderick Terry is a citizen of the United States and a resident of the District of Columbia.

4. Defendant Ogden is the Executive Director of the Council on Legal Education Opportunity (CLEO). CLEO is a non-profit entity within the American Bar Association under the ABA Fund for Justice and Education. CLEO's mission is to

2

diversify the legal profession by improving the enrollment and graduation rates of minority students in ABA-accredited law schools. Defendants Horowitz and Lichtenstein are Directors at ABA and responsible for oversight of CLEO and the Thurgood Marshall Legal Educational Opportunity Program.

## FACTUAL ALLEGATIONS

5. Mr. Terry is a licensed attorney employed by Defendant ABA. Mr. Terry graduated from law school in 1989, and acquired litigation and transactional experience with a law firm in Pittsburgh, and was later employed with the Office of the Attorney General for the District of Columbia, and in private practice. He is admitted to the District of Columbia bar and is in good standing.

6. In November 2003, Mr. Terry was hired by the ABA for the position of Law School Academic Coordinator at CLEO in Washington, DC. In that position, he coordinated academic enhancement seminars for student participants in the Thurgood Marshall Legal Educational Opportunity Program, and provided ongoing academic support and counseling for the participants.

7. In 1998, Congress, by statute, created the "Thurgood Marshall Legal Educational Opportunity Program" to be administered by the U.S. Department of Education ("DOE"). Under this program, DOE was "authorized to enter into a contract with, or make a grant to, the Council on Legal Education Opportunity, for a period of not less than 5 years..." *See* Pub. L. 105-244, § 721 (Oct. 7, 1998), *codified at* 20 U.S.C. § 1136. Congress initially authorized direct appropriations of "$5,000,000 for fiscal year 1999 and each of the 4 succeeding fiscal years." *Id* at § 721 (h), codified at 20 U.S.C. § 1136(h). In 2008, Congress amended 20 U.S.C. § 1136(h), so that $5 million grants are

3

now authorized for fiscal year 2009 and each of the five succeeding fiscal years." *See* Pub. L. 110-215, § 704(h) (Aug. 14, 2008), amending 20 U.S.C. § 1136(h). This is a direct statutory appropriation to the ABA's Council on Legal Education Opportunity (CLEO), which is designed to improve the enrollment and graduation rates of minority students in law schools. Since 2001, the ABA has received nine grants from DOE to run the CLEO program, totaling $34,731,013, with eight percent (approximately $1,284,588) allocated directly to the ABA for overhead in administering the grants.

8. The U.S. Department of Education requires CLEO to submit annual budgets to DOE that set forth federal fund expenditures by project, the personnel who will work on those projects, and the projected expenses for each line item. This is required since Congress has directly appropriated, by statute, DOE's annual payments to the Thurgood Marshall program.

9. In June 2006, the ABA promoted Mr. Terry to the position of Associate Director of CLEO. In that position, he reported to Cassandra Sneed Ogden, CLEO Executive Director. His job responsibilities included assisting the Executive Director with preparing program budgets that CLEO submitted to the U.S. Department of Education, monitoring CLEO's compliance with the budgets, and serving as the ABA's liaison to DOE regarding federal budget compliance. He also performed a wide range of responsibilities related to CLEO's operations, student outreach, and program development, and provided support on academic, legal and policy issues related to the funded projects, and supported the work of the CLEO Council and its committees. Through March 2011, Mr. Terry consistently received highly favorable performance evaluations and performance-based bonuses.

10. When he first assumed the Associate Director position in 2006, Mr. Terry had a limited knowledge of the federal grant application process. Early in his tenure as Associate Director, he primarily provided background material for the application narrative such as student program objectives, law school tuition updates and other general information updates. Ms. Ogden prepared the budget and the budget narrative.

11. By 2007, Mr. Terry had begun to gain a better understanding of the grant application process. As he gained a better understanding of the process, he realized that previous grant applications that ABA/CLEO had submitted to the Department of Education to draw down the federal appropriation contained numerous padded and false expenses (e.g. permanent personnel positions which were never filled, erroneous pre-law travel recruitment expenses, erroneous travel by the law school academic coordinator, erroneous presenter travel for college scholar seminars, consultant positions which were not filled, sub-contracts that were never awarded and various other smaller line-items that were questionable).

12. In 2008, Mr. Terry attempted to remove the erroneous/false expenses from the budget submitted to DOE and replace them with actual, documented expenses. Mr. Terry was successful in some instances, but his efforts were met with great resistance from Ms. Ogden. Ms. Ogden insisted that certain personnel, sub-contract and consultant line-items be kept in the grant over several years, even though she had no intention of filling the positions (e.g. Program Evaluator/Statistician ($75,000); Records Management Assistant ($25,920); Minority Bar Association Initiatives ($75,000); and CLEO-like Programs ($50,000)). The Records Management Assistant position was placed in the grant application for four years (2006/2007/2008/2009) but was never filled with a

permanent employee. Rather, funds for the Records Management position and other permanent and consultant positions were diverted to pay numerous temporary employees, primarily Ms. Ogden's personal friends and associates, and other CLEO operating expenses. One temporary employee is Jacqueline Hancock, Ms. Ogden's personal friend and occasional housekeeper, who has been employed as a temporary employee at CLEO for approximately nine years and paid from the federal grant. Ms. Hancock was not eligible to be hired on a permanent basis because she is a convicted felon. Other temporary employees hired by Ms. Ogden over the years included her high school classmate Janice Clemmons, who provided temporary service from Atlanta, Georgia; her hair stylist Gobie Black and numerous other friends and associates.

13. Ms. Ogden included Ms. Hancock's resume in the 2006, 2007, 2008 and 2009 grant applications, along with CLEO permanent personnel, to give DOE the impression that Ms. Hancock is a permanent member of the ABA/CLEO staff, even though the ABA never certified her employment. The Records Management Assistant position was eliminated from the grant in 2010 after Mr. Terry sent Ms. Ogden, Elissa Lichtenstein and ABA Director of Human Resources, Annette Reyes, an email from DOE Program Specialist Reginald Williams, stating that "all grant positions must be filled at the requested levels at all times during the approved grant funding cycle."

14. Over the years of federal grants that have been awarded to ABA/CLEO, ABA/CLEO has spent millions of dollars in federal funds to hire temporary and part-time employees not authorized by the grant. Ms. Ogden hired most of the temporary employees, approximately 80 to 90 since the grant's inception, through Diversity Services, a company owned by a friend of Ms. Ogden.

15. By 2009, as a result of Mr. Terry's involvement with the grant and his efforts to comply with federal requirements, Ms. Ogden had less room to manipulate the grant funds. At this point, most vacant permanent and consultant positions had been eliminated from the grant application by Mr. Terry and the program offerings were drastically increased, consuming all of the federal appropriation. As a result, Ms. Ogden devised a new scheme to conceal the program and travel expenses by "jimmying the budget." When Mr. Terry presented Ms. Ogden with the 2010 draft budget, which was unbalanced by $370,000, Ms. Ogden simply slashed the numbers in the budget summary without reducing the expenses in the budget narrative. This tactic has caused CLEO to be drastically over budget for a number of years, especially in the travel expense category.

16. CLEO is currently in the process of spinning-off from the ABA and becoming an independent organization. As part of CLEO's transition from the ABA, the CLEO Council authorized Ms. Ogden to hire an accounting firm, Cobbs, Bazillo & Associates, to review CLEO's finances and to render an opinion on the advantages and disadvantages of separating from the ABA. The accounting firm concluded that the CLEO had been operating in the red for a number of years. The accounting firm was paid $13,000 for its work, but the firm's formally written unqualified opinion was not revealed or shared with the CLEO Council or any members of the CLEO staff.

17. In 2010, Ms. Ogden attempted to distance herself from the grant process. Mr. Terry was assigned the task of preparing the initial draft of the 2010 grant application. Ms. Ogden was nonresponsive to Mr. Terry's questions about grant programs and expenses. Ms. Ogden agreed to speak to Mr. Terry about the grant application only after Mr. Terry complained to Ms. Ogden's supervisors. When Ms.

Ogden did meet with Mr. Terry, she attempted to persuade him to cut and paste an excel spreadsheet which she had prepared with employee salaries into the grant budget. Although there were only twelve staff positions, Ms. Ogden's spreadsheet contained thirteen staff positions. Ms. Ogden's intent was to pay Jackie Hancock from the erroneous thirteenth position but Mr. Terry caught the scheme.

18. Starting in the summer of 2010, Mr. Terry raised specific concerns about grant compliance issues – initially with Ms. Ogden, who dismissed them out of hand, and then with ABA Human Resources Director Annette Reyes, by both telephone and email starting on August 9, 2010. Mr. Terry raised the following concerns with both Ms. Ogden and Ms. Reyes:

   a. Ms. Ogden hired her personal friends and acquaintances of her friends (e.g., , Nerissa Skillman, Judy Kim and Chipo Nyambuya) to do contract work not authorized under the DOE grant – e.g., the payment to Ms. Nyambuya was $41,507, even though the grant line item for the work that she did was only $21,000.

   b. Ms. Ogden incurred travel expenses significantly exceeding budgeted amounts, or not included in the budget, particularly for the Executive Director's travel. DOE specifically told Mr. Terry that program staff travel must be clearly identified in the budget, and only those individuals who are identified in the budget as working on the project can travel on grant funds.

   c. Ms Ogden used temporary employees to fill positions that the budget stated would be filled by permanent ABA employees, particularly to hire a friend, Jacqueline Hancock (a convicted felon who could not be hired by ABA as a

regular employee). Ogden used Ms. Hancock's resume in the budget to make her appear to be a regular ABA employee. Ogden rejected Mr. Terry's recommendation of two candidates out of ten interviewed for the Records Management Assistant position, and kept Ms. Hancock in that position as a temporary employee. Although Ms. Ogden approved an employment requisition for the Records Management Assistant position, she prevented the position from being filled. DOE told Mr. Terry that since the budget requested a full time position, DOE expected the staffing pattern to remain, and DOE also told Mr. Terry that ABA could not change the scope and staffing pattern after the budge was approved.

d. Ms. Ogden used a friend's agency (Diversity Services) to hire temporary employees from 2002 through 2008, and thereby provided her friend with a lucrative contract, instead of using the ABA's authorized temporary employee service contractor. It was not until 2010 that Ogden used the ABA'a authorized temporary service.

e. Ms. Ogden submitted budgets that called for financial assistance awards to be distributed to CLEO fellows at law schools, but she unilaterally diverted the funds, without authorization from DOE, from the student grants to operational expenses and other overhead. Mr. Terry also reported that Ogden was "jimmying" the budget through deliberately underreporting financial assistance awards and travel expenses in the budgets.

19. On August 24, 2010, Mr. Terry met Ms. Reyes (HR Director), Jim Swanson (Senior Director, DC Operations); Robert Horowitz (Director); Elissa

9

Lichtenstein (Director and Ms. Ogden's supervisor), and Nick Michna (Director of Training and Development). At this meeting, Mr. Terry discussed these issues at length. He explained that his DOE contacts had told him that CLEO was required to request written approval for any expenditures and programmatic changes that were not in the budgets, to forego any potential audit liability, as required by the DOE regulations, 34 C.F.R. Sec. 74.25. Mr. Horowitz seemed unhappy with Mr. Terry's reports because he had signed these contracts. Mr. Swanson agreed that Ms. Ogden was trying to "jimmy" the budget.

20. At the August 24, 2010 meeting, Mr. Terry also told the senior management that Ms. Ogden improperly gave a consulting contract to Judy Kim to "analyze alumni data . . . to support CLEO's lobbying and promotional efforts," which violated both the federal Anti-Lobbying Act, 18 U.S.C. Sec. 1913 (no appropriated funds may be used for lobbying) and the DOE regulations, 34 C.F.R. Sec. 82.110(a) (same). ABA management refused to address this issue, or any of the other issues that Mr. Terry reported on August 24, 2010.

21. On October 20, 2010, Mr. Terry again met with Mr. Horowitz and Ms. Lichtenstein, to provide additional information about these issues, because ABA had not responded to his complaint. In response, Horowitz and Lichtenstein claimed that all of Ms. Ogden's actions were "acceptable," but they provided no justification for their assertions. Mr. Terry reiterated to them that his contacts at DOE had told him otherwise.

22. On February 28, 2011, Ms. Ogden requested that Keijon Waters (CLEO Financial Administrator) "re-code" the excess payments to Ms. Nyambuya to remove them from the federal grant account. On March 2, 2011, Mr. Terry told the senior

10

managers who attended the August 24, 2010, meeting about the improper request by Ms. Ogden to cover-up the excess payments.

23. On March 7, 2011, Mr. Swanson informed Mr. Terry that Harriet Ouma, the ABA Director of Internal Audit, would investigate his disclosures about CLEO's budgets and expenditures. Mr. Terry met with Ms. Ouma on March 10, 2011. Ms. Ouma specifically told Mr. Terry that he was protected as a "whistleblower." In addition to the issues that Mr. Terry had previously raised with ABA senior management in August 2010, he also discussed with Ms. Ouma the general misuse of federal funds by CLEO, including travel by the Executive Director and unauthorized hotel expenses incurred by CLEO Council Members. Mr. Terry also explained that in several years, federal funds that were supposed to go to the students (for stipends and financial assistance awards) were instead improperly diverted to cover CLEO operational and travel expenses.

24. Mr. Terry explained to Ms. Ouma that the CLEO/Thurgood Marshall budget for the years 2009, 2010, 2011 and the 2011 revised budget included the position description for the Executive Director position, which stipulated that CLEO's Executive Director would hold an active bar membership. However, Ms. Ogden's membership in the District of Columbia bar was suspended in 1999 for non-payment of dues, and her membership in the Maryland Bar was also suspended as of June 10, 1994 for non-payment of dues. For at least three years, Ms. Ogden submitted budgets to the DOE which falsely stated that she had an active bar membership.

25. Mr. Terry also reported to Ms. Ouma the hostile work environment created by Ms. Ogden, including her demands that he create a paper trail against former CLEO Law School Academic Coordinator Duane Tobias so that he could be fired after

11

he filed a disability discrimination complaint against her, and her retaliation against Mr. Terry when he refused to go along with her illegal demands regarding Mr. Tobias. Unbeknown to Mr. Tobias, Ms. Ogden wanted to fire him because he had an aunt who was employed by DOE, and Ms. Ogden was afraid that he would discuss CLEO internal operations with his aunt.

26. On June 14, 2011, Ms. Ouma provided Mr. Terry with her audit/analysis of three years of CLEO expenditures under the federal grants, which she said showed "common trends identified over three years of misuse of grant funds."

27. In June 2011, Ms. Ouma's Audit Report was completed and shared with ABA management and CLEO Council executive officers. At that time, Ms.Ouma told Mr. Terry that the ABA had decided to allow CLEO to spin-off from the ABA as an independent organization. However, Ms. Ouma explained that for CLEO to continue to receive medical, retirements and other benefits from the ABA, ABA management would ask the CLEO Council to replace Ms. Ogden as the Executive Director.

28. Ms. Ouma specifically told Mr. Terry that her audit report concluded that there was "extreme misuse of federal dollars over several years" through excessive travel, unfilled grant positions, and excessive use of temporary and part-time employees, all of which reduced the funds available for student programs and financial assistance, which was supposed to be the primary purpose of the federal appropriations from DOE to CLEO.

29. On September 22 and 23, 2011, Ms. Ouma informed Mr. Terry that Ms. Ogden and her supervisor, Ms. Lichtenstein, were trying to fire both Mr. Terry and Mr. Keijon Waters (CLEO Financial Administrator, who also participated in the internal

audit), or otherwise have them demoted, but that ABA Human Resources refused to approve those retaliatory actions. Ms. Ouma told Mr. Terry that this was a "classic case of retaliation," that he had a lot of support at the ABA and that he should fight this. Mr. Terry expressed shock at learning that he was to be fired or demoted. Ms. Ouma reassured him that his job would be protected.

30.   On September 26, 2011, Ms. Ogden told Mr. Terry that he should attend a meeting to discuss the realignment of CLEO staff responsibilities under the 2011 revised federal grant application. At that meeting, Ms. Ogden and Ms. Lichtenstein informed Mr. Terry that he would assume the duties of the Law School Academic Coordinator position, and that some of his duties as the CLEO Associate Director would be removed or reduced, even though he had held the Associate Director position for six years. Specifically, Mr. Terry would no longer be responsible for the Six-Week Summer Institute, which is CLEO's flagship program, or the various college-level programs (e.g., Road to Law School; Sophomore Super Saturday; Juniors Jumpstart the LSAT; Achieving Success in the Application Process), even though the supervision of those programs was the major part of his job duties and responsibilities. Ms. Ogden and Ms. Lichtenstein acknowledged hat the revised federal budget (which had already been submitted to and approved by DOE) did not reflect these changed job duties, and were alarmed when Mr. Terry asked why these new job duties were not included in the revised application. Further, the revised budget listed substantially lower budget amounts (or even a zero amount) for the programs that the new Law School Academic Coordinator/Associate Director position was to supervise, so that this position would have substantially more diminished responsibilities. Mr. Terry requested a written

summary of these changes. (The written changes were given to Mr. Terry on October 19, 2011.) Ms. Ogden and Ms. Lichtenstein told Mr. Terry that if he did not accept the new position, he would be given two weeks' severance pay for each year he had worked at the ABA, and one month of medical benefits, and would have to resign that same day.

31. Even before Ms. Ogden told Mr. Terry that he would have to accept the downgraded job responsibilities, she had already begun to transfer his job duties to other employees. For example, Ms. Ogden had staff who are not attorneys (Leigh Allen - Mentoring/Development Coordinator and Bernetta Hayes -Director of Admissions/Administrator) prepare proposals and coordinate student programs, even though the projects should have been assigned to Mr. Terry. Ms. Ogden also excluded Mr. Terry from numerous meetings involving the law student and college student programs even though those programs were at the core of Mr. Terry's job responsibilities. Ms. Ogden claimed that she did so because Mr. Terry "complicates matters" and had become a "thorn in her side." Ms. Ogden also repeatedly told Mr. Terry that he was "too conservative in [his] interpretation of federal grant rules and regulations," a clear reference to her strong displeasure with his protected conduct in insisting that the ABA comply with the federal statutes and regulations governing the use of the federally appropriated ABA/CLEO funds.

32. On September 27, 2011, Ms. Ogden gave Mr. Terry a downgraded performance evaluation, which was significantly lower (2.26 on a 1-5 scale) than his March 2011 mid-year review (3.57) and his 2010 evaluation. In fact, during the year leading up to the evaluation, Mr. Terry had performed the additional duties of the Law School Academic Coordinator since April 2010, as Mr. Tobias had resigned and had not

been replaced. Thus, even though Mr. Terry was performing two jobs at the same time, and was doing so in a professional manner, Ms. Ogden downgraded his performance evaluation without justification. The consequence of this evaluation was that it would be easier for Ms. Ogden to place Mr. Terry on a performance track, or to take other adverse employment actions against him.

33. On October 3, 2011, the DOE approved the revised budget, which had no position for the Law School Academic Coordinator (which Ms. Ogden and Ms. Lichtenstein forced Mr. Terry to assume), but the Associate Director position remained intact. ABA could not modify the duties and responsibilities in the budget without a written request and approval from DOE. The demotion of Mr. Terry to a position with lesser responsibilities was to a non-funded position and was a further violation of the federal grants.

34. On October 19, 2011, Mr. Terry received a new Job Description from the ABA via Elissa Lichtenstein, which detailed his new duties and responsibilities. In the new position description, Mr. Terry's supervisory role was reduced from five people to one person, and his duties and responsibilities were substantially changed from from the duties and responsibilities that had been approved by DOE in the 2011 revised application.

35. On November 15, 2011, Mr. Terry was told by DOE Program Specialist Reginald Williams that the ABA had not requested in writing or received approval from DOE to change the duties and responsibilities of the Associate Director position as described in the 2011 revised grant application, as required by federal regulations.

36. During these incidents, Mr. Terry experienced a great deal of anxiety and emotional distress. On November 23, 2011, Mr. Terry visited his doctor and was placed on medication to alleviate stress, anxiety and lack of sleep. Mr. Terry was away from work on short term disability from December 2011 through April 2012, due to preexisting medical conditions that had been exacerbated by the stress placed on Mr. Terry by ABA.

37. Upon his return to work in late April 2012, Mr. Terry was told by Ms. Ogden that he would not be traveling to any CLEO Programs or conferences. He continues to be excluded from any and all management meetings and prevented from performing the duties of the CLEO Associate Director.

## COUNT I
## Violation of the False Claims Act

Plaintiff adopts by reference each of the allegations in paragraphs above as if fully set forth in Count I.

38. Plaintiff Terry is a private individual entitled to bring a claim on behalf of the United States under the False Claims Act, 31 U.S.C. Sec. 3729 et seq.

39. At all pertinent times, Defendants ABA and CLEO were employers subject to provisions of the False Claims Act, 37 U.S.C. Sec. 3729 et seq. Defendants Ogden, Horowitz and Lichtenstein are "persons" under the False Claims Act.

40. The False Claims Act allows private litigants to bring actions on behalf of the government against anyone who knowingly presents or causes to be presented to the government a false or fraudulent claim, or knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim.

41. In violation of the False Claims Act, Defendants ABA and CLEO, beginning on or before 2001 and continuing through the present, knowingly, intentionally, and willfully submitted numerous false grant applications to the U.S. Department of Education to obtain funds for the ABA's Council on Legal Education Opportunity, and then CLEO engaged in extreme misuse of federal dollars awarded under the grants. Since 2001, the ABA has received nine grants from DOE to run the CLEO/Thurgood Marshall program, totaling $34,731,013, with eight percent (approximately $1,284,588) allocated directly to the ABA for overhead in administering the grants. Defendant Ogden "cut and paste" travel expenses in the grant applications submitted to DOE in 2002, 2003, 2005 and 2006, for travel that never occurred. ABA was paid by DOE to monitor CLEO and if failed to do so. Defendant Ogden included several permanent positions and consultant positions in grant applications for 2003, 2005, 2006, 2007, 2008 and 2010, which were never filled. The money for the positions was allocated by DOE and Defendant Ogden raided the funds and diverted the funds to CLEO operational expenses and non-grant expenses. Millions of dollars were used by Defendant Ogden to pay numerous temporary and pat-time employees even though there was never a line item for such expenses in any of the grant applications. Defendant Ogden made a unilateral decision NOT to distribute student financial assistance awards to eligible students authorized by the grant and diverted the funds to CLEO operational expenses and non-grant expenses. Plaintiff Terry reported the fraud to ABA and his claims were not addressed. ABA later initiated an internal audit which revealed that there was extreme misuse of the federal dollars over several years through excessive travel, unfilled grant positions and excessive use of temporary and part-time employees,

which reduced the funds available for student programs and financial assistance for minority students entering law school and law school students.

42. At the time Defendants made false statements and misused federal funds, Defendants knew or had reason to know that they were submitting false grant applications to the federal government and misusing federal funds.

WHEREFORE, Plaintiff Terry prays as follows:

A. That the court enter judgment against the Defendants, and enjoin Defendants from engaging in conduct in violation of the False Claims Act;

B. That the court award to Plaintiff Terry all damages available under the False Claims Act, including treble damages for each act of fraud and fraudulent invoice;

C. Award payment of all fees, costs, expenses, including attorney's fees and expert fees; and

D. That the Court award Plaintiff Terry such other relief as to which he may be deemed entitled.

Date: 8/14/2012

Respectfully submitted,

/s/ David A. Branch
David A. Branch, DC Bar # 438764
Law Offices of David A. Branch and
Associates, PLLC
1901 Pennsylvania Avenue, NW
#802
Washington, DC 20006
(202) 785-2805 phone
(202) 785-0289 fax
dablaw@erols.com